1  ROBBINS GELLER RUDMAN
       & DOWD LLP
2  DARREN J. ROBBINS (168593)
   TRAVIS E. DOWNS III (148274)
3  BENNY C. GOODMAN III (211302)
   DAVID W. MITCHELL (199706)
4  BRIAN O. O'MARA (229737)
   655 West Broadway, Suite 1900
5  San Diego, CA 92101
   Telephone: 619/231-1058
6  619/231-7423 (fax)
   darrenr@rgrdlaw.com
7  travisd@rgrdlaw.com
   bennyg@rgrdlaw.com
8  davidm@rgrdlaw.com
   bomara@rgrdlaw.com
9
   Attorneys for Plaintiffs
10 [Additional counsel appear on signature page.]

11                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
12                        SOUTHERN DIVISION

13 POMPANO BEACH POLICE &          )  VIA FAX
   FIREFIGHTERS' RETIREMENT        )            SACV10-01449 DOC (JEMx)
14 SYSTEM and WESTERN              )  No.
   WASHINGTON LABORERS-            )
15 EMPLOYERS PENSION TRUST,        )
   Derivatively on Behalf of ALLERGAN, )  VERIFIED SHAREHOLDER
16 INC.                            )  DERIVATIVE COMPLAINT FOR
                                   )  VIOLATION OF THE FEDERAL
17                    Plaintiffs,  )  SECURITIES LAWS, BREACH OF
                                   )  FIDUCIARY DUTY, ABUSE OF
18       vs.                       )  CONTROL, GROSS
                                   )  MISMANAGEMENT AND
   DAVID E.I. PYOTT, DEBORAH       )  CORPORATE WASTE
19 DUNSIRE, LEONARD D.             )
   SCHAEFFER, RUSSELL T. RAY,      )
20 HERBERT W. BOYER, ROBERT A.     )
   INGRAM, TREVOR M. JONES,        )
21 DAWN HUDSON, GAVIN S.           )
   HERBERT, LOUIS J. LAVIGNE, JR., )
22 MICHAEL R. GALLAGHER and        )
   STEPHEN J. RYAN,                )
23                    Defendants,  )
                                   )
24       – and –                   )
                                   )
25 ALLERGAN, INC., a Delaware      )
   corporation,                    )
26                    Nominal Defendant. )  DEMAND FOR JURY TRIAL
                                   )
27

28

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1332(a)(2) in that this action presents a federal question and the plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Jurisdiction is also conferred by §27 of the Securities Exchange Act of 1934 ("Exchange Act").  This Court has supplemental jurisdiction over the claims premised on state law asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

2.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this judicial district so as to render the exercise of jurisdiction by the district courts of this District permissible under traditional notions of fair play and substantial justice.

3.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  Several defendants either reside in or maintain executive offices in this District, and have received substantial compensation in this District by engaging in activities and conducting business here, which has an effect in this District.

**SUMMARY OF THE ACTION**

4.     This is a shareholder derivative action on behalf of nominal defendant Allergan, Inc. ("Allergan" or the "Company") against its entire Board of Directors (the "Board") and certain of its top officers for breach of fiduciary duty and corporate waste.  By this action, plaintiffs seek to recover damages and obtain other relief against defendants for illegally promoting Allergan's flagship product Botox® for uses not approved by the United State Food and Drug Administration ("FDA").

Defendants' actions are responsible for severely damaging Allergan's once valuable corporate franchise by showing a pattern and practice of violating federal regulations and failing to comply with various FDA rules and regulations.

5.     For the last ten years, defendants caused Allergan to market and sell Botox, which was misbranded and lacked adequate directions for its use. Specifically, defendants caused Allergan to market and promote Botox for off-label uses, including treatments for headache, pain, spasticity, and juvenile cerebral palsy – none of which had been approved by the FDA.

6.     Defendants were aware that their marketing and promotional practices were improper and violated applicable federal law. Indeed, defendants were notified of these improper practices on several occasions:

(a)     On August 22, 2001, defendants received a letter informing them that the FDA had reviewed Allergan's Botox "promotional activities and materials and . . . concluded that they are misleading and lacking in fair balance within the meaning of 21 U.S.C. §352(a) of the Federal Food, Drug, and Cosmetic Act (the Act)." The letter referenced previous FDA objections "*to these activities in Review Memoranda dated December 12, 1998 and September 25, 2000, and untitled letters dated November 7, 2000, February 14, 2001, and April 12, 2000.*"

(b)     On June 23, 2003, defendants received another FDA Warning Letter informing defendants that several of Allergan's "advertisements are false and/or misleading because they falsely identify [Botox] as a cosmetic treatment, fail to reveal material facts about the product's use, and minimize the risk information presented." The Warning Letter referenced an earlier letter from the FDA dated September 5, 2002, which objected to Allergan's promotional materials.

7.     Despite these warnings, defendants continued their illegal and improper off-label sales and marketing practices. And it was only a matter of time until investigative authorities learned of defendants' ongoing scheme. It started with several "whistleblowers" filing *qui tam* actions:

- 2 -

1    • *United States ex rel. Lang, et al. v. Allergan, Inc.*, Case No. 07-cv-

2    1288 (N.D. Ga., filed June 5, 2007), alleging violations of the False Claims Act,

3    31 U.S.C. §§3729-3733, and the federal Anti-Kickback Statute, 42 U.S.C.

4    §1320a-7b.

5    • *United States ex rel. Beilfuss, et al. v. Allergan, Inc.*, Case No.

6    08-cv-10305 (D. Mass., filed Feb. 22, 2008), alleging violations of the False

7    Claims Act, 31 U.S.C. §3729 *et seq.*

8    • *United States ex rel. Hallivis v. Allergan, Inc.*, Case No. 09-cv-

9    2817 (D. Md., filed Oct. 26, 2009), alleging violations of the False Claims Act,

10   31 U.S.C. §§3729-3733.

11       8.      The U.S. Department of Justice (the "DOJ") soon intervened in these

12   actions, and on September 1, 2010, the DOJ filed a criminal information against

13   Allergan in the United States District Court for the Northern District of Georgia.

14   *U.S.A. v. Allergan, Inc.*, Case No. 10-CR-375 (N.D. Ga., filed Sept. 1, 2010).  The

15   DOJ accused the Company of violating federal false claims and anti-kickback laws,

16   among others.   To resolve these criminal and civil complaints, and as a result of

17   defendants' misconduct, Allergan agreed to plead guilty and pay a fine of $600

18   million.

19       9.      As a result of the foregoing, defendants breached their fiduciary duties of

20   loyalty and good faith owed to Allergan and its shareholders. By this action, plaintiffs

21   seek damages against defendants for the injuries to the Company caused by these

22   affirmative faithless acts.   Allergan has expended, and will continue to expend,

23   significant sums of money reacting to defendants' illegal conduct and these actions

24   have irreparably damaged Allergan's corporate image and goodwill.  Plaintiffs now

25   bring this action on behalf of Allergan and seeks to compensate Allergan for the harm

26   caused to it by the conduct of the individuals responsible for the corporation's conduct

27   – the directors and senior management – and to impose appropriate responsibility

28   upon those individuals.

**THE PARTIES**

10.　(a)　Plaintiff Pompano Beach Police & Firefighters' Retirement System ("Pompano Beach") is a shareholder of Allergan and has held Allergan stock continuously since September 2003.  Pompano Beach will fairly and adequately represent the interests of Allergan.  Pompano Beach is a citizen of the state of Florida.

(b)　Plaintiff Western Washington Laborers – Employers Pension Trust ("Western Washington") is a shareholder of Allergan and has held Allergan stock continuously since September 2004.  Western Washington will fairly and adequately represent the interests of Allergan.  Western Washington is a citizen of the state of Washington.

11.　Nominal defendant Allergan is a Delaware corporation with its principal executive offices located at 2525 Dupont Drive, Irvine, California 92612.  Allergan specializes in manufacturing and marketing specialty pharmaceuticals (primarily eye care, skin care, and neuromodulators) and medical devices (primarily breast implants, gastric bands for obesity surgery, and injectable dermal fillers used on facial wrinkles).  Botox represents approximately 30% of Allergan's net sales.

12.　Defendant David E.I. Pyott ("Pyott") has served as Allergan's Chairman of the Board since 2001 and as the Company's Chief Executive Officer ("CEO") since 1998.  Pyott is a resident of California.

13.　Defendant Herbert W. Boyer ("Boyer") has served as Allergan's Vice Chairman since 2001.  Boyer served as Chairman from 1998 to 2001 and has been a Board member since 1994.  Boyer is a resident of California.

14.　Defendant Deborah Dunsire ("Dunsire") has served as an Allergan director since 2006.  Dunsire is a resident of Massachusetts.

15.　Defendant Michael R. Gallagher ("Gallagher") has served as an Allergan director since 1998.  Gallagher is a resident of California.

16.　Defendant Gavin S. Herbert ("Herbert") is the founder of Allergan and has served as Chairman Emeritus since 1996.  Herbert is a resident of California.

17. Defendant Dawn Hudson ("Hudson") has served as an Allergan director since 2008. Hudson is a resident of New York.

18. Defendant Robert A. Ingram ("Ingram") has served as an Allergan director since 2005. Ingram is a resident of North Carolina.

19. Defendant Trevor M. Jones ("Jones") has served as an Allergan director since 2004. Jones is a resident of the United Kingdom.

20. Defendant Louis J. Lavigne, Jr. ("Lavigne") has served as an Allergan director since 2005. Lavigne is a resident of California.

21. Defendant Russell T. Ray ("Ray") has served as an Allergan director since 2003. Ray is a resident of Massachusetts.

22. Defendant Stephen J. Ryan ("Ryan") has served as an Allergan director since 2002. Ryan is a resident of California.

23. Defendant Leonard D. Schaeffer ("Schaeffer") has served as an Allergan director since 1993. Schaeffer is a resident of California.

24. The defendants named in ¶¶12-23 are sometimes referred to herein as the "Individual Defendants."

**DUTIES OF THE ALLERGAN DIRECTORS AND OFFICERS**

25. By reason of their positions as officers, directors, and/or fiduciaries of Allergan and because of their ability to control the business and corporate affairs of Allergan, each defendant owed Allergan and its public shareholders the duty to exercise the highest degree of loyalty, good faith, independence and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. Defendants were and are required to act in furtherance of the best interests of Allergan and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. As the Delaware Chancery Court explained: "Loyalty. Good faith. Independence. Candor. These are words pregnant with obligation. The Supreme Court did not adorn them with half-hearted adjectives. Directors should not take a seat at the board table

prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor." *In re Tyson Foods, Inc. Consol. S'holder Litig.*, No. 1106-CC, 2007 Del. Ch. LEXIS 120, at *10-*11 (Del. Ch. Aug. 15, 2007).

26.     The conduct of Allergan's directors and officers complained of herein involves a knowing and culpable violation of their fiduciary obligations, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders which the directors and officers were aware, or should have been aware, posed a risk of serious injury to the Company.   The illegal conduct of Allergan's directors and officers has been ratified by Allergan's Board, which has failed to take any action against them, despite knowledge of such actions and demands that proper remedial and preventative action be taken.

27.     To discharge their fiduciary duties of loyalty, good faith, independence and candor, Allergan's directors and officers were required, among other things, to:

(a)     in good faith, manage, conduct, supervise and direct the business and affairs of Allergan and its subsidiaries in accordance with the applicable laws, and the charter and by-laws of Allergan;

(b)     neither violate nor knowingly permit any director, officer or employee of Allergan and its subsidiaries to violate applicable federal or state laws, rules and regulations or any rule or regulation of Allergan;

(c)     remain informed as to the status of Allergan's operations, and upon receipt of notice or information of imprudent, unsound or unlawful practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or stop such practices; and

(d)     ensure that Allergan was operated in a diligent, honest and prudent manner in compliance with all applicable federal and state laws, rules and regulations.

28.     By reason of their corporate positions and their ability to control the business and corporate affairs of Allergan, defendants were required to use their ability to control Allergan in a fair, just and equitable manner, as well as to act in

furtherance of the best interests of Allergan and its stockholders and not in furtherance of their own personal interests or ideology. In violation of their fiduciary duties, defendants caused Allergan to conduct its business in an unsafe, imprudent, dangerous and illegal manner.

29.     Defendants participated in the wrongdoing complained of herein in order to improperly benefit themselves by pursuing their own agendas instead of what was in the best interests of the Company, and to remain as directors and officers of a public corporation and to continue and prolong the illusion of Allergan's success and to conceal the adverse facts concerning Allergan's dismal record of compliance with federal regulations so that they could protect and perpetuate their directorial and/or executive positions and increase the substantial compensation, perks and prestige they obtained thereby. Such participation involved, among other things, planning and creating (or causing to be planned and created), proposing (or causing the proposal of) and authorizing, and approving and/or acquiescing in the illegal conduct complained of herein.

30.     At all times relevant hereto, defendants Pyott, Dunsire, Schaeffer, Ray, Boyer, Ingram, Jones, Hudson, Herbert, Lavigne, Gallagher and Ryan were each the agent of each of the other defendants and of Allergan, and were at all times acting within the course and scope of such agency.

31.     Defendants breached their duties of loyalty and good faith by failing to implement and ensure the effective execution of sufficient internal controls such that Allergan was complying with legal and regulatory requirements, including the proper labeling and marketing of Botox. As a result, the Company will pay $600 million in penalties and fines for its criminal and civil violations, and is exposed to additional potential civil liability for the wrongful acts of its officers and directors. Allergan has expended, and will continue to expend, significant sums of money as a result thereof.

32.     Defendants Gallagher, Hudson, Ryan, Lavigne and Ray, as members of the Audit and Finance Committee, were responsible for monitoring the Company's

internal controls, disclosure controls and procedures and financial reporting practices. According to the Audit and Finance Committee Charter, the Audit and Finance Committee (Gallagher, Hudson, Ryan, Lavigne and Ray) is primarily responsible for providing oversight of financial management and the independent auditors, and ensuring: (i) that management is maintaining an adequate system of internal control regarding the Company's finance, accounting and legal compliance; and (ii) that the Company is in compliance with legal and regulatory requirements. The Audit and Finance Committee is also charged with reviewing, among other things, (i) the process by which the CEO and CFO engage in due diligence for and execute the quarterly Sarbanes-Oxley certifications, (ii) any legal matters that could have a significant impact on the Company's financial statements and compliance with applicable laws and regulations, and (iii) inquiries received from regulators or governmental agencies. In performing these functions, the Audit and Finance Committee meets with the independent auditors, management, and internal auditors (including in private sessions) to review their work and confirm that they are properly discharging their respective responsibilities.

33.    Defendants Pyott, Boyer, Dunsire, Herbert, Ingram, Jones, Lavigne, Ryan and Schaeffer each have substantial scientific backgrounds and expertise in the life sciences and pharmaceutical industry from which they understand, or should understand, the critical importance of adequate internal controls and oversight over the proper sales, labeling and marketing of pharmaceuticals. Despite their backgrounds and expertise, these defendants failed to ensure that Allergan's internal controls were sufficient. In particular, these defendants had the following expertise:

(a)    Pyott served as head of the Nutrition Division and a member of the Executive Committee of Novartis AG, a company specializing in the research, development, manufacturing and marketing of a broad range of healthcare and pharmaceutical products. Pyott is also currently a director of Edwards Lifesciences Corporation, a manufacturer of tissue heart valves and repair products. Pyott also

- 8 -

1    serves on the board and the Executive Committee of the California Healthcare

2    Institute; serves on the board, Executive Committee and as Chairman of the

3    International Affairs Committee of the Biotechnology Industry Organization; and is a

4    member of the board of the Pan-American Ophthalmological Foundation, the

5    International Council of Ophthalmology Foundation, and the Advisory Board for the

6    Foundation of The American Academy of Ophthalmology.

7              (b)     Boyer has a bachelor's degree in biology and chemistry and a

8    Ph.D.  Boyer is a founder of Genentech, Inc., a biotechnology company focusing on

9    the discovery, development, manufacture and commercialization of medicines to treat

10   patients with serious or life-threatening medical conditions.  Boyer served as a

11   director of Genentech from 1976 to 2009.  Boyer is a member of the National

12   Academy of Sciences and a Fellow in the American Academy of Arts & Sciences.  In

13   the Company's 2010 Proxy Statement, defendants portray Boyer as an individual who

14   possesses "extensive scientific and business management background in

15   biotechnology."

16             (c)     Dunsire has a medical degree and has served as President and CEO

17   of Millennium Pharmaceuticals, Inc., now known as "Millennium: The Takeda

18   Oncology Company," since July 2005.  Prior to joining Millennium, Dunsire led the

19   Novartis U.S. Oncology Business, and served on the U.S. Pharmaceutical Executive

20   Committee at Novartis.  Dunsire is also a current board member of the Biotechnology

21   Industry Organization.  In the Company's 2010 Proxy Statement, defendants portray

22   Dunsire as an individual who "brings to [Allergan's] board considerable

23   pharmaceutical management and operations experience."

24             (d)     Herbert is Chairman and founder of Regenesis Bioremediation

25   Products and serves on the board of the Doheny Eye Institute and the Advisory Board

26   for the Foundation of the American Academy of Ophthalmology.

27             (e)     Ingram is Chairman of the Board of OSI Pharmaceuticals, Inc.,

28   lead director of Valeant Pharmaceuticals International, and is a director of Edwards

1  Lifesciences Corporation.   In the Company's 2010 Proxy Statement, defendants

2  portray Ingram as an individual who possesses "a wealth of executive knowledge and

3  experience in the pharmaceutical industry."

4       (f)   Jones has a bachelor of pharmacy degree and Ph.D. from the

5  University of London.  Jones is also a Fellow of The Royal Pharmaceutical Society,

6  and from 1994 to 2004, Jones was the Director General of the Association of the

7  British Pharmaceutical Industry.  Jones is Chairman of the Board of ReNeuron Group

8  plc and Synexus Ltd, and a board member of Merlin Biosciences Fund II and

9  NextPharma Technologies Holdings Ltd., Sigma-Tau Finanziaria S.p.A. and its

10 subsidiary Sigma-Tau Industrie Farmaceutiche Riunite S.p.A, Tecnogen S.p.A,

11 Verona Pharma plc and SciClone Pharmaceuticals, Inc.  In the Company's 2010 Proxy

12 Statement, defendants portray Jones as an individual who "possesses in-depth

13 government relations experience."

14       (g)   Lavigne was Executive Vice President and CFO of Genentech, Inc.

15 from March 1997 through March 2005, having joined Genentech in 1982.

16       (h)   Ryan has a medical degree and is the President of the Doheny Eye

17 Institute.  Ryan is a member of the Institute of Medicine of the National Academy of

18 Sciences and is a member and past President of numerous ophthalmological

19 organizations, including the Association of University Professors of Ophthalmology.

20 Ryan is the founding President of the National Alliance for Eye and Vision Research.

21       (i)   Schaeffer is Chairman of the Board of Surgical Care Affiliates,

22 Inc. and is a member of the Board of Directors of Amgen, Inc. and the Advisory

23 Board of the National Institute for Health Care Management.

24                              **FACTUAL ALLEGATIONS**

25       34.   This lawsuit describes a corporate culture based on preserving revenue

26 growth through the illegal off-label promotion and sale of Botox.  Allergan produces

27 and manufactures Botox, a prescription pharmaceutical formulation of botulinum

28

1  toxin type A, a purified neurotoxin, to which it received the rights in 1991 from
2  Oculinum, Inc., the drug's original developer.

3      35.     During the relevant time period, one vial of Botox cost approximately
4  $400 to $500 for 100 units, and treatment of most off-label uses of Botox required
5  injections of anywhere between 100 and 400 units or more.[1]  Since Botox's effect on a
6  muscle wears off over time, patients require re-injection at periodic intervals,
7  generally every three months.  Botox is a "buy and bill" drug, meaning that doctors
8  purchase Botox directly from Allergan and assume the risk that they will get
9  reimbursed on the back end by a healthcare payer after submitting the claim.
10  Consequently, doctors would not inject Botox for off-label uses if they were not sure
11  that they could be reimbursed.[2]

12      36.     Allergan was aware of the prohibitions on promoting and marketing a
13  drug or biologic in interstate commerce for off-label uses.  Indeed, since as early as its
14  1997-2001 Strategic Plans, defendants made it a top corporate priority to maximize
15  sales of Botox for spasticity, migraine headache and pain, none of which were
16  approved by the FDA.  This was because, among other reasons, many of defendants'

17  _____

18  [1]     Botox has limited approval and licensing by the FDA as a biological product
19  ("biologic") and drug.  Although perhaps best known for its use in connection with
   cosmetic facial aesthetics, the FDA first approved Botox for the treatment of certain
20  neuromuscular disorders.  During the relevant period, the four conditions that Botox
   had been approved to treat were relatively rare in comparison to the off-label
21  conditions that Allergan actively promoted Botox to treat, e.g., headache, pain, and
   spasticity, including juvenile cerebral palsy.  For example, with respect to headaches
22  associated with cervical dystonia, Allergan's 2003 Botox Foundation Training
   Materials estimated that in the United States the prevalence of cervical dystonia was
23  slightly less than 9 people out of 100,000 (0.0009%), which would correlate to
   approximately 27,000 Americans who had the condition in a population of
24  approximately 300 million.

25  [2]     Once a drug is approved for a particular use, the FDA does not prevent doctors
   from prescribing the drug for uses that are different than those approved by the FDA.
26  It is, however, illegal for a pharmaceutical company to promote off-label uses to
   prescribers.  Allowing off-label prescriptions coincides with the FDA's mission to
27  regulate the pharmaceutical industry without directly regulating the practice of
   medicine.

28

1    yearly Strategic Plans forecast that Botox's on-label sales would shrink and that all
2    incremental growth would come from off-label sales.

3        37.    As part of this initiative, Allergan asked the FDA to expand the Botox
4    label to include treatment of headache associated with cervical dystonia ("CD"). The
5    FDA refused. Undeterred by the poor clinical trial results and FDA's unwillingness to
6    expand the Botox label to include the treatment of headache associated with CD
7    without further evidence of efficacy, Allergan continued to market and promote Botox
8    as a treatment for headaches by claiming that CD was misdiagnosed or
9    underdiagnosed. In an email, an Allergan executive states: "It's too bad that there is
10   no easy way to obtain 'headache' in our label (even as part of CD). . . . Has the US
11   Marketing group exploited the notion of much higher prevalence of CD in the
12   population?"

13       38.    Defendants' off-label marketing efforts during the relevant period also
14   included sales calls by Allergan sales representatives ("BMCs" or "Botox Medical
15   Consultants," later called, "NMCs" or "Neurotoxin Medical Consultants") on
16   physicians who would not typically treat patients who had any of the four FDA-
17   approved conditions.

18       39.    In fact, on August 22, 2001, defendants received a letter addressed to
19   David Garbe, Director, Scientific Information and Medical Compliance, informing
20   them that the FDA had reviewed Allergan's Botox "promotional activities and
21   materials and . . . concluded that they are misleading and lacking in fair balance within
22   the meaning of 21 U.S.C. §352(a) of the Federal Food, Drug, and Cosmetic Act (the
23   Act)." The letter cautioned:

24           You have engaged in repeated promotional activities that suggest
25           the amount of protein in BOTOX minimizes the formation of antibodies.
26           No formal clinical studies have been performed to study BOTOX
27           treatment with different amounts of protein with respect to the formation
28           of antibodies. Additionally, you have repeatedly included favorable data

or conclusions from nonclinical studies of BOTOX in a way that suggests they have clinical significance when, in fact, no such clinical significance has been demonstrated. ***We have previously objected to these activities in Review Memoranda dated December 12, 1998 and September 25, 2000, and untitled letters dated November 7, 2000, February 14, 2001, and April 12, 2001.***

The FDA concluded by stating that "[t]he violations noted in this letter represent continuing examples of violative promotion or advertising materials disseminated by Allergan," and explaining that a "written response with the specific steps that you have taken to correct the violations should be submitted to this office within 10 working days of receipt of this letter."

40.     Thereafter, on June 21, 2002, Allergan distributed to all sales and marketing personnel the PhRMA Code on Interaction with Healthcare Professionals and the "Allergan Field Reference Guide."   The Allergan Field Reference Guide emphasized that

you may not promote any Company product for uses that are not addressed in the approved product labeling or insert . . . .   This promotional ban applies not only to sales calls, but to all marketing efforts such as product launches, sales meetings and activities of third-parties controlled by Allergan.

41.     On June 23, 2003, defendants again received an FDA Warning Letter addressed to Peter Kresel, who at the time was Allergan's Senior Vice President of Global Regulatory Affairs, informing defendants that several of Allergan's "advertisements are false and/or misleading because they falsely identify [Botox] as a cosmetic treatment, fail to reveal material facts about the product's use, and minimize the risk information presented." The Warning Letter referenced an earlier letter dated September 5, 2002, which objected to Allergan's "dissemination of promotional

1  materials for BOTOX® COSMETIC that failed to appropriately communicate the

2  approved indication for use."  A written response was required within ten days.

3      42.    Allergan's U.S. Securities and Exchange Commission ("SEC") Form 10-

4  K annual report to shareholders for the calendar year ending December 31, 2004,

5  acknowledged that:

6          Physicians may prescribe pharmaceutical or biologic products for uses

7          that are not described in a product's labeling or differ from those tested

8          by us and approved by the FDA.  While such "off-label" uses are

9          common and the FDA does not regulate a physician's choice of

10         treatment, the FDA does restrict a manufacturer's communications on

11         the subject of off-label use.  Companies cannot actively promote FDA-

12         approved pharmaceutical or biologic products for off-label uses, but they

13         may disseminate to physicians articles published in peer reviewed

14         journals. . . . If, however, our promotional activities fail to comply with

15         the FDA's regulations or guidelines, we may be subject to warnings

16         from, or enforcement action by, the FDA or another enforcement agency.

17     43.    Despite warnings and defendants' knowledge that these off-label

18 marketing practices were forbidden by the FDA, defendants continued their illegal

19 practices.  Defendants used a variety of tactics to carry out Allergan's illegal off-label

20 marketing strategy, including: (i) providing "value-added" reimbursement support

21 services; (ii) lobbying healthcare payers to expand coverage for off-label uses; (iii)

22 funding and controlling continuing medical education programs on off-label uses; and

23 (iv) paying doctors to attend advisory boards on off-label uses, promotional dinners to

24 tout Botox's efficacy for off-label uses, and creating and funding organizations to

25 promote off-label uses of Botox. For most of the relevant time period, Botox

26 "Customer Team Units," or "CTUs," coordinated sales initiatives among numerous

27 different departments, including its sales/marketing, medical affairs (purportedly

28

1   independent scientific advisors), and reimbursement divisions which permitted more

2   focused communication of its off-label marketing messages.

3   **"Value-Added" Reimbursement Support Services**

4   44.   Allergan recognized that the "biggest obstacle"' to growing Botox sales

5   was the lack of reimbursement for off-label uses.  Even though government and

6   private healthcare payers covered Botox for every FDA-approved indication, Allergan

7   doubled the size of its reimbursement support team in 2003 to "minimize customer

8   barriers" for the use of Botox for headache, pain and spasticity.

9   45.   The Botox reimbursement team was an extension of the sales force, and

10   its express goal was to improve injector economics by selling more Botox.  The pitch

11   for the Botox reimbursement programs – collectively referred to as the "Botox

12   Advantage Program" – was "Improving the Reimbursement Environment for Today

13   and For the Future by Providing Comprehensive Reimbursement Assistance,

14   Reducing Reimbursement Issues, Saving You Time and Effort!"

15   46.   Allergan cited "reimbursement" as the "#1 reason limiting M.D. Botox

16   use" and increased its reimbursement services to drive off-label sales.

17   **Allergan Lobbied Healthcare Payers to**
**Expand Coverage for Off-Label Uses**

18   

19   47.   Notwithstanding the lack of scientific support for headache or pain,

20   Allergan initiated a carefully orchestrated campaign to: (i) expand Botox coverage for

21   off-label uses, and (ii) eliminate any payer-imposed limitation on the amount of Botox

22   injected into patients (*i.e.*, "dosing caps").  Allergan recruited and used physician

23   "advocates" to lobby Medicare and Medicaid decision-makers to expand coverage for

24   off-label uses.

25   48.   Allergan also funded and controlled a patient advocacy group, an

26   organization whose mission was to expand patient access to Botox.  Doctors were paid

27   $1,000 each to attend the patient advocacy group regional workshops where Allergan

28

reimbursement personnel coached them how to successfully lobby healthcare payers to cover off-label uses of Botox.

**Allergan Directed Physician Training,
Workshops, and Dinners**

49.     Allergan funded and controlled the content of hundreds of continuing medical education ("CME") seminars, injection workshops, and promotional dinner programs at which paid speakers identified by the Company as "Key Opinion Leaders" advocated Botox for off-label indications.  For example, in 2004, a CME provider worked with Allergan to develop purported CME programs to address the use of Botox to treat pain and spasticity. Allergan also created the Centers of Excellence as an "independent" CME to drive the use of Botox to treat headaches.  It was also a "Management Business Objective" for Allergan's scientific services group to create, edit and control the substance of off-label CMEs, including for treatment of headaches.

**Allergan Paid Doctors to Attend
"Advisory Boards"**

50.     Allergan hosted numerous "Advisory Boards," purportedly designed to elicit feedback from doctors about their experience with Botox. These "Advisory Boards" represented another opportunity for Allergan to promote Botox for off-label indications and "build loyalty and solidify important relationships."  For example, in 2005, approximately 100 top-prescribing doctors attended the "Allergan Institute of Distinction" ("AIOD"), an invitation-only Botox marketing program held at Allergan's corporate headquarters and the Balboa Bay Club and Resort in Newport Beach.  Doctors attending the AIOD provided no consulting services, but were paid $1,500 to listen to off-label marketing presentations.

**Allergan Created and Funded Organizations
to Promote Botox for Off-Label Uses**

51.     In addition to the patient advocacy organization, Allergan created and funded a purportedly independent organization, an on-line neurotoxin education

1    organization to "stimulate increased use of Botox." The Mission Statement for this

2    on-line neurotoxin education organization was to "validate and disseminate consistent

3    information regarding the expanding uses of Botox." While this on-line neurotoxin

4    education organization purported to be an independent, third-party organization,

5    Allergan admitted its control over the organization, stating that "they act under our

6    direction in creating the content and setting direction." From 1999 to 2005, Allergan

7    gave approximately $8 million in "unrestricted" grants to this on-line neurotoxin

8    education organization. This on-line neurotoxin education organization maintained a

9    web site to disseminate information about off-label uses, including videos of CME

10   programs sponsored by Allergan and other written materials prepared by Allergan.

11   Allergan's sales representatives were specifically trained to refer doctors to the on-line

12   neurotoxin education organization website during sales calls.

13        52.    It was only a matter of time until defendants' illegal scheme was brought

14   to light. It started with several "whistleblowers" filing *qui tam* actions:

15        •    *United States ex rel. Lang v. Allergan, Inc.*, Case No. 07-cv-1288

16        (N.D. Ga., filed June 5, 2007), alleging violations of the False Claims Act, 31

17        U.S.C. §§3729-3733, and the federal Anti-Kickback Statute, 42 U.S.C. §1320a-

18        7b, for (i) making and causing others to make false and fraudulent statements to

19        physicians regarding Botox's efficacy (as well as scientific and clinical

20        evidence in support thereof) for the treatment of headaches and dozens of other

21        conditions that the drug has never been approved by the FDA to treat; (ii)

22        concealing the off-label and unreimbursable nature of numerous Botox uses,

23        and encouraging physicians and their staffs, as well as the staffs of hospitals

24        and other medical institutions, to use false or improper codes or otherwise

25        falsely or improperly document patient conditions and treatments; (iii) offering

26        and providing illegal remuneration to physicians, in the form of cash, travel,

27        lodging, and meals, as an inducement to prescribe Botox to patients for both

28        off-label and approved indications, and provide corresponding injection

services; and (iv) making and causing others to make false and fraudulent statements regarding Botox's efficacy for the off-label treatment of headaches to Medicare contractors, Medicare contractors' advisory committees (that act as the Medicare contractors' agents), and physicians who Allergan solicited to contact these Medicare contractors and the advisory committees.

- *United States ex rel. Beilfuss v. Allergan, Inc.*, Case No. 08-cv-10305 (D. Mass., filed Feb. 22, 2008), alleging violations of the False Claims Act, 31 U.S.C. §3729 *et seq.*, arising out of requests for payment by Medicaid, Medicare, TRICARE, and other federally-funded government healthcare programs as a result of defendants' marketing plan which induced physicians to prescribe Botox for particular off-label uses (and off-label dosages) which are neither FDA approved nor demonstrated to be safe and effective.

- *United States ex rel. Hallivis v. Allergan, Inc.*, Case No. 09-cv-2817 (D. Md., filed Oct. 26, 2009), alleging violations of the False Claims Act, 31 U.S.C. §§3729-3733, arising out of defendants' knowing marketing and promotion of Botox for the off-label use for control of overactive bladder and incontinence due to neurogenic bladder, and making false and misleading statements to treating doctors and other medical personnel who can prescribe medicine to the effect that Botox was medically accepted for the off-label uses being promoted, and therefore eligible for Medicare reimbursement.

53.    Then, on September 1, 2010, the United States Attorney for the Northern District of Georgia announced that Allergan agreed to plead guilty to a criminal information and pay $600 million to resolve its criminal and civil liability arising from the Company's unlawful promotion of Botox for uses not approved as safe and effective by the FDA. The resolution includes a criminal fine and forfeiture totaling $375 million and a civil settlement with the federal government and the states of $225 million.

54.    The DOJ press release explained:

United States Attorney [Sally Quillian] Yates said, "The FDA had approved therapeutic uses of Botox for only four rare conditions, yet Allergan made it a ***top corporate priority to maximize sales of far more lucrative off-label uses that were not approved by FDA***.  Allergan further demanded tremendous growth in these off-label sales year after year, even when there was little clinical evidence that these uses were effective.   The FDA approval process ensures that pharmaceutical companies market their medications for uses that are proven to be effective, and this case demonstrates that companies that fail to comply with these rules face criminal prosecution and stiff penalties."

Under the Food, Drug and Cosmetic Act (FDCA), a company in its application to the FDA must specify each intended use of a biological product.  After the FDA approves the product as safe and effective for a specified use, any promotion by the manufacturer for other uses – known as "off-label" uses – renders the product misbranded.

\*     \*     \*

The Criminal Information also alleges that Allergan's off-label marketing tactics included calling on doctors who typically treat patients with off-label conditions.   In 2003, Allergan doubled the size of its reimbursement team to assist doctors in obtaining payment for off-label Botox® injections.  Allergan held workshops to teach doctors and their office staffs how to bill for off-label uses, conducted detailed audits of doctors' billing records to demonstrate how they could make money by injecting Botox®, and operated the Botox® Reimbursement Hotline which provided a wide array of free on-demand services to doctors for off-label uses.  Allergan also lobbied government healthcare programs to expand coverage for off-label uses, directed physician workshops and dinners focused on off-label uses, paid doctors to attend "advisory

boards" promoting off-label uses, and created a purportedly independent online neurotoxin education organization to stimulate increased use of Botox® for off-label indications.

In a plea agreement with the United States, Allergan will pay a criminal fine of $375 million, which includes forfeiting assets of $25 million. Allergan's guilty plea and sentence is not final until accepted by the U.S. District Court.

"This global resolution marks the end of an investigation that exemplifies what can be accomplished when there is cooperation between law enforcement agencies sharing information and working together," said United States Attorney Yates. "Allergan's unlawful marketing activities first came to light when two whistleblowers, a doctor who was an Allergan consultant and a Botox® sales representative, filed a False Claims Act complaint against Allergan here in Atlanta. Our investigation continued to expand after two more whistleblower complaints were filed against Allergan in the District of Massachusetts and the District of Maryland and were transferred to Atlanta where our investigation was underway. The second complaint was filed by two former Allergan employees in the Botox® reimbursement division, and the third by an Allergan sales representative. In Atlanta we will thoroughly and aggressively investigate whistleblower claims and bring those who have violated the law to justice."

In a separate civil settlement agreement, Allergan has agreed to pay an additional $225 million to the federal government and the states to resolve claims that its unlawful marketing practices caused false claims to be submitted to government health care programs such as Medicare, Medicaid, TRICARE, and to the Federal Employees Health

1    Benefit Program, the Department of Veterans' Affairs and the

2    Department of Labor's Office of Workers' Compensation Programs.

3    The civil settlement addresses allegations that from 2001 through at least

4    2008, Allergan promoted Botox for off-label indications that were not

5    medically accepted and therefore not covered by federal healthcare

6    programs, made unsubstantiated and misleading statements about the

7    efficacy of Botox® for off-label indications, instructed doctors to

8    miscode Botox® claims for uncovered indications using inappropriate

9    diagnosis codes to ensure payment by government healthcare programs,

10   and provided inducements to doctors to inject more Botox®. The federal

11   share of the civil settlement amount is $210,250,000, and Allergan will

12   pay up to $14,750,000 to states that opt to participate in the agreement.

13        55.    As a result of defendants' misconduct, Allergan was also forced to

14   execute a Corporate Integrity Agreement ("CIA") with the Department of Health and

15   Human Services, Office of Inspector General. The five-year CIA requires, among

16   other things, that (i) the Allergan Board (or a subcommittee thereof) annually review

17   the Company's compliance program and certify its effectiveness; (ii) certain senior

18   executives annually certify that their departments or functional areas are compliant;

19   (iii) Allergan send doctors a letter notifying them about the settlement; and (iv) the

20   Company post on its website information about payments to doctors, such as

21   honoraria, travel or lodging. Should defendants materially breach the CIA, Allergan

22   will be further damaged because it will be subject to exclusion from federal health

23   care programs, including Medicare and Medicaid, for a material breach of the CIA,

24   and subject to additional monetary penalties for less significant breaches.

25   **THE MATERIALLY MISLEADING PROXY STATEMENTS**

26        56.    On or about March 20, 2008, March 19, 2009, and March 12, 2010

27   defendants caused Allergan to file with the SEC its Annual Proxy Statements for 2008

28

on Form DEF 14A (respectively, the "2008 Proxy Statement," the "2010 Proxy Statement," and the "2010 Proxy Statement") (collectively, the "Proxy Statements").

57.     Each of the Proxy Statements were materially false and misleading in that they were inaccurate and failed to disclose numerous highly material facts and circumstances.  The materially inaccurate Proxy Statements caused direct harm to the Company in that, among other things, defendants' omissions perpetuated the systematic legal violations within the Company, which brought about the severe fines, penalties, and other liabilities to which the Company was ultimately subjected, as well as through the creation of compensation obligations by the Company that would not have existed but for the materially inaccurate and incomplete Proxy Statements.

58.     Each of the Proxy Statements was intended to, and did, procure Allergan's shareholders' votes with respect to matters materially affecting the Company that legally required shareholder approval.  Each of the 2008, 2009 and 2010 Proxy Statements sought and obtained election of the defendants by shareholder vote, in each case upon the Board's explicit recommendation as to which directors should be elected.

59.     Each director on the Board was duty-bound pursuant to his or her general fiduciary duties under Delaware law and by the provisions of federal securities laws to fully disclose all information material to shareholders' decision concerning how to cast their votes in connection with the election of Board members in 2008, 2009, and 2010 and with respect to their decision whether to vote to approve the massive potential compensation increases embodied in the 2008 Incentive Award Plan.

60.     The 2008 Incentive Award Plan, which defendants included in the 2008 Proxy Statement and for which defendants sought and obtained shareholder approval, authorized a twenty million share increase in the stock available for grants to the Company's employees, executives, and directors for as little as one year of positive performance.  The 2008 Incentive Award Plan was particularly lucrative to the Company's directors since it *automatically* provides them with 11,400 stock options

1    and 14,400 shares of restricted stock yearly.  Defendants portrayed the 2008 Incentive

2    Award Plan as a necessary increase in potential compensation to reward high-

3    performing employees, officers, and outside directors.

4              (a)    As a result of the false and misleading 2008 Proxy Statement and

5    their reelection to the Board in 2008, defendants entered into compensation contracts

6    with the Company and afforded themselves a generous compensation program via a

7    shareholder vote on the false and misleading 2008 Proxy Statement.  Defendants'

8    compensation for the year ended December 31, 2008, was as follows:

|           | Fees Earned/Paid in Cash | Stock and Option Awards | Other Compensation | Total Compensation |
|-----------|--------------------------|-------------------------|--------------------|--------------------|
| Boyer     | $121,000                 | $323,527                | $2,662             | $447,188           |
| Dunsire   | $62,000                  | $164,431                | $341               | $470,477           |
| Gallagher | $65,000                  | $428,233                | $2,626             | $495,859           |
| Herbert   | $57,000                  | $428,233                | 0                  | $485,233           |
| Hudson    | $53,000                  | $516,179                | 0                  | $569,179           |
| Ingram    | $70,000                  | $323,527                | $590               | $394,116           |
| Jones     | $61,000                  | $325,779                | $754               | $387,533           |
| Lavigne   | $67,000                  | $435,293                | 0                  | $502,293           |
| Ray       | $89,000                  | $323,527                | 0                  | $412,527           |
| Ryan      | $75,000                  | $428,233                | $779               | $504,011           |
| Schaeffer | $72,000                  | $325,779                | $3,129             | $400,908           |

17             (b)    As a result of the false and misleading 2008 Proxy Statement and

18   2009 Proxy Statement, defendants were reelected to the Board in 2009 and entered

19   into compensation contracts with the Company, affording themselves a generous

20   compensation program via a shareholder vote on the false and misleading 2009 Proxy

21   Statement. Defendants' compensation for the year ended December 31, 2009, was as

22   follows:

|           | Fees Earned/Paid in Cash | Stock and Option Awards | Other Compensation | Total Compensation |
|-----------|--------------------------|-------------------------|--------------------|--------------------|
| Boyer     | $126,000                 | $834,991                | $2,838             | $963,829           |
| Dunsire   | $64,000                  | $163,087                | $607               | $227,694           |
| Gallagher | $72,000                  | $163,087                | $2,934             | $238,021           |
| Herbert   | $61,000                  | $163,087                | 0                  | $224,087           |
| Hudson    | $70,000                  | $163,087                | 0                  | $233,087           |
| Ingram    | $75,000                  | $163,087                | $893               | $910,884           |
| Jones     | $64,000                  | $834,991                | $818               | $227,905           |
| Lavigne   | $71,000                  | $163,087                | 0                  | $234,087           |

|  | Fees Earned/Paid in Cash | Stock and Option Awards | Other Compensation | Total Compensation |
|---|---|---|---|---|
| Ray | $92,000 | $671,904 | 0 | $926,991 |
| Ryan | $80,000 | $163,087 | $847 | $243,934 |
| Schaeffer | $77,000 | $834,991 | $3,143 | $243,230 |

61.     Despite their obligations under fiduciary duty and the federal securities laws, defendants caused Allergan to file and disseminate the materially inaccurate Proxy Statements. Specifically, in Allergan's definitive Proxy Statements, defendants provided materially misleading information and disclosures concerning the Company, the general responsibilities of the Board and its committees, and the basis upon which the members of the Board (or prospective members of the Board) were seeking election to another (or initial) term of office.  In the Proxy Statements, defendants uniformly failed to disclose material information to shareholders concerning critical aspects of the Board's responsibilities and activities – such as the Board's obligation to assure compliance with applicable drug marketing laws and regulations, or the fact that the financial and operating metrics disclosed in the Proxy Statements were the result of widespread criminal misconduct within Allergan that the Board was duty-bound to prevent.

62.     The Proxy Statements were materially inaccurate and incomplete because; among other things, defendants failed to disclose:

(a)     The extent to which the Company's financial performance depended on the Company's off-label marketing of Allergan drugs – including Allergan's most important drug, Botox – which exposed the Company and its shareholders to tremendous regulatory, reputational, and financial risk;

(b)     The circumstances surrounding the Board's waiver or constructive waiver of explicit provisions of the Code of Business Conduct and Ethics including with respect to defendants' duties to ensure legal compliance, to ensure the reporting of legal violations, and to themselves report suspected non-compliance – even though